# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8288 | **DATE** | 10/3/2001 |
| **CASE TITLE** | DANIEL JOHNSON vs. CITY OF ELGIN | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Status hearing held.  Enter Memorandum Opinion And Order.  Defendants' motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 0 4 2001 | 73 |
| ✓ | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | CM | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| LG | courtroom deputy's initials | FOR DOCKETING 01 OCT -3 PM 5: 31 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION.

| | |
|---|---|
| DANIEL JOHNSON ) | |
| ) | |
| Plaintiff, ) | Case No. 99 C 8288 |
| ) | |
| v. ) | The Honorable John W. Darrah |
| ) | |
| CITY OF ELGIN; CHIEF OF POLICE ) | |
| WILLIAM MILLER, in his individual ) | |
| and official capacity; DEPUTY CHIEF ) | |
| BURNS, in his individual and official ) | |
| capacity; SERGEANT MONA ) | |
| MCKINLEY, in her individual and ) | |
| official capacity; and SERGEANT ) | |
| DONALD THIEL, in his individual ) | |
| and official capacity, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Johnson ("Plaintiff" or "Johnson") has filed suit against Defendants, the City of Elgin ("Elgin"), Chief of Police William Miller ("Miller"), Deputy Chief Burns ("Burns"), Sergeant Mona McKinley ("McKinley") and Sergeant Donald Thiel ("Thiel") for race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended 42 U.S.C. § 2000(e) *et seq.*, 42 U.S.C. §§ 1981 and 1983. (Compl. ¶1.) Johnson alleges that Defendants disciplined and terminated him from his position as a probationary police officer in the Elgin Police Department because of his race (African-American) as part of a continuing pattern and practice of discriminating against police officers on the basis of race. Johnson also alleges that the allegedly discriminatory discipline and termination denied him the full and equal benefit of all laws and proceedings as is enjoyed by white citizens. Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56,

claiming that Plaintiff cannot show that he was discriminated against because of his race. Miller, Burns, McKinley and Thiel move for summary judgment, claiming that Plaintiff cannot show that they were directly responsible for any adverse employment action against him. For the reasons that follow, the Court grants their motion for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate through specific evidence that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726,

731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## **BACKGROUND**

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts [1] (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1") and exhibits are as follows.

Plaintiff Daniel Johnson, an African-American, was employed by the City of Elgin as a probationary police officer from late January or early February 1998 until June 22, 1999. (Def.'s 56.1 ¶ 3.) Defendant City of Elgin is a municipality that operates the Elgin Police Department. (Def.'s 56.1 ¶ 4.) Elgin employs 162 sworn officers in the police department and 10 non-sworn community service officers. (Def.'s 56.1 ¶ 4.) The highest ranking member of the department is the Chief of Police. (Def.'s 56.1 ¶ 4.) Directly reporting to the Chief are three deputy chiefs, six lieutenants and fifteen sergeants. (Def.'s 56.1 ¶ 4.)

Defendant William Miller has been Chief of Police for the Elgin Police Department since

---

[1]Plaintiff has not complied with LR. 56.1(b), which specifies that the party opposing summary judgment will file "a concise response to the movant's statement that shall contain ... a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Plaintiff has provided responses which deny Defendants' statements without any support from the record and, instead, attempt to supply additional facts. A court may strike 56.1 statements in their entirety when they contain evasive answers and improper argument as such tactics defeat the purpose for which Rule 56.1 was implemented. *Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). Although the statement has not been struck in its entirety, all 56.1 responses which fall into this category are deemed admitted.

May 1999. (Def.'s 56.1 ¶ 5.) Defendant James Burns is one of three deputy chiefs for the Elgin Police Department. (Def.'s 56.1 ¶ 6.) Defendant Mona McKinley is a sergeant for the Elgin Police Department. (Def.'s 56.1 ¶ 7.) In 1999, she was one of two sergeants on the midnight shift. (Def.'s 56.1 ¶ 7.) Defendant Donald Thiel is a sergeant for the Elgin Police Department. (Def.'s 56.1 ¶ 8.) In 1999, he was one of two sergeants on the midnight shift. (Def.'s 56.1 ¶ 8.)

Pursuant to section 10-2.1-1 of the Illinois Municipal Code, 65 Ill. Comp. Stat. 5/10-2.1-1 (2001), Elgin established a Board of Fire and Police Commissioners to appoint all members of the police department and to conduct and hold all examinations and disciplinary hearings as provided by law. (Def.'s 56.1 ¶ 9.)

Any officer hired for the department remains on probationary status for the first eighteen months of employment. (Def.'s 56.1 ¶ 12.) If the officer completes the probationary period, he or she becomes a non-probationary officer. (Def.'s 56.1 ¶ 12.) A non-probationary officer can be discharged only for cause and only after a formal hearing before the Board, during which the officer has the right to present evidence and cross-examine witnesses. (Def.'s 56.1 ¶ 13.) A probationary officer is employed at-will. (Def.'s 56.1 ¶ 14.) The Board can terminate a probationary officer with or without cause. (Def.'s 56.1 ¶ 14.) The Board need not afford a probationary officer a formal hearing with the right to present evidence and cross-examine witnesses. (Def.'s 56.1 ¶ 14.)

Miller regards the probationary period as part of the selection process. (Def.'s 56.1 ¶ 15.) He believes that once officers become non-probationary and possess certain job protections, they are more likely to remain with the department for a long time. (Def.'s 56.1 ¶ 15.) Miller wants to be highly confident in a probationary officer's performance and conduct before that officer becomes a non-probationary officer. (Def.'s 56.1 ¶ 15.) Thus, Miller is more likely to recommend the

discharge of a probationary officer than of a non-probationary officer. (Def.'s 56.1 ¶ 15.)

Johnson's twelve-month February 9, 1999 performance evaluation was performed by Thiel. (Pl.'s 56.1 ¶ 10.) Thiel marked Johnson as "completely satisfactory/acceptable performance" in twenty-one out of twenty-three categories. (Pl.'s 56.1 ¶ 11.) He marked Johnson as "requires improvement" in the remaining two categories. (Pl.'s 56.1 ¶ 11.)

Elgin uses "employee contact forms," which are either commendatory or "corrective in nature". (Pl.'s 56.1 ¶ 39.) A member of the command staff, including a sergeant, has the sole discretion to fill out a corrective "employee contact form" relating to an officer. (Pl.'s 56.1 ¶ 40.) McKinley used her discretion as Johnson's supervisor to issue him two employee contact forms on January 29, 1999, and to write a counseling memo regarding her perception of Johnson's conduct and place it in his shift file. (Pl.'s 56.1 ¶ 41, 42.) Thiel used his discretion as Johnson's supervisor to issue him an employee contact form on March 9, 1999. (Pl.'s 56.1 ¶ 44.) Burns orally reprimanded Johnson in October 1998. (Pl.'s 56.1 ¶ 46.) The employee contact forms and counseling sessions for Johnson were disciplinary in nature. (Pl.'s 56.1 ¶ 49.)

The employee contact forms were as follows. (1) On June 6, 1998, Johnson had angry words with another employee concerning leaving a prisoner unattended. (Def.'s 56.1 ¶ 42.) (2) On August 7, 1998, Sergeant Beeter reported that he had attempted to reprimand Johnson for leaving his place of assignment to get a complaint notarized, but Johnson was not amenable to the discipline. Later that evening, Beeter thought he saw Johnson looking at "body parts" on the computer screen; but when he asked Johnson what he was looking at, Johnson cleared the screen. (Def.'s 56.1 ¶ 42.) (3) On October 3, 1998, Johnson was orally reprimanded for submitting an inaccurate overtime pay slip. (Def.'s 56.1 ¶ 42.) And (4) on January 29, 1999, Johnson was told three times to return to the street

and made a disparaging remark about a female dispatcher in front of other officers and civilians during roll-call. (Def.'s 56.1 ¶ 42.)

Following an incident on April 22, 1999, Johnson was recommended for discharge. On that day, after hearing the name of a high school friend, David Binion, in connection with suspected criminal activity, Johnson drove his squad car to Binion's home late that night. (Def.'s 56.1 ¶ 17.) Johnson was involved in the investigation and arrest of Binion. (Def.'s 56.1 ¶ 18.) Binion asked Johnson what his bond would be, and Johnson said that he thought it would be $100. (Def.'s 56.1 ¶ 19.) Binion gave Johnson telephone numbers of two people who might be able to provide bond for him, but neither person answered the telephone when Binion called. (Def.'s 56.1 ¶ 20.) Because Binion is a friend, Johnson asked his senior officer, John Grey, if Binion could be released on his own recognizance. (Def.'s 56.1 ¶ 21.)

Binion asked Johnson for $100. (Def.'s 56.1 ¶ 22.) Johnson then went to the ATM machine, while on duty and in uniform, and withdrew money and gave it to Binion. (Def.'s 56.1 ¶¶ 23, 24.) Johnson thought that Binion might use the $100 for bail bond. (Def.'s 56.1 ¶ 25.) Binion used the $100 to pay for bail. (Def.'s 56.1 ¶ 26.)

On April 23, 1999, Grey reported to McKinley that he had observed Johnson provide money to Binion the night before. (Def.'s 56.1 ¶ 27.) Grey told McKinley that he believed the money was for bail. (Def.'s 56.1 ¶ 27.) Because she was concerned that an officer may have violated an Illinois statute prohibiting police officers from posting bond, McKinley asked Grey and Johnson to submit memoranda to her regarding the events surrounding Binion's release. (Def.'s 56.1 ¶ 28.)

In his memorandum, Grey reported that he had asked McKinley if Binion could be released on his own recognizance but that she had refused to permit him to do that. (Def.'s 56.1 ¶ 29.) Grey

reported that he made the request because of Johnson's belief that, if Johnson asked McKinley, she would say no. (Def.'s 56.1 ¶ 29.) Grey also reported that he saw Johnson give Binion $100. (Def.'s 56.1 ¶ 29.)

Johnson reported in his memorandum that Binion was a high-school friend and that he arrested him when he heard on the dispatch radio that there was a signed complaint against Binion. (Def.'s 56.1 ¶ 30.) Johnson reported that he told Binion that his bond would probably be $100. (Def.'s 56.1 ¶ 30.) Johnson reported that Binion tried to call two people who did not answer the telephone. (Def.'s 56.1 ¶ 30.) Binion then asked for Johnson's help with bond, and Johnson complied. (Def.'s 56.1 ¶ 30.) Binion was released. (Def.'s 56.1 ¶ 30.)

After this incident was brought to the attention of police administration, a deputy chief forwarded the matter to Sergeant Tom Linder, the assistant to the chief for internal affairs, to investigate the matter. (Def.'s 56.1 ¶ 31.) During the investigation, Johnson was represented by counsel, Jack Genius. (Pl.'s 56.1 ¶ 104.) Genius instructed Johnson not to talk to any members of the police department about the incident. (Pl.'s 56.1 ¶ 104.)

In the course of his investigation, Linder interviewed several witnesses. (Def.'s 56.1 ¶ 32.) At the end of his investigation, he created a final report, which included transcripts of tape-recorded interviews of Grey, McKinley, Binion and Johnson; notes of other interviews; and records of shift-level discipline Johnson received. (Def.'s 56.1 ¶ 32.) Linder summarized the contents of the report in a disciplinary review form, in which he recommended Johnson's termination. (Def.'s 56.1 ¶ 32.) He submitted the full report to Chief Miller. (Def.'s 56.1 ¶ 32.)

In his interview, Grey reiterated what he had said and reported to McKinley, adding that Johnson told him that Binion was Johnson's friend and asked him how could they "take care of this."

(Def.'s 56.1 ¶ 33.) McKinley told Linder that Grey had asked whether Binion could be released on his own recognizance. (Def.'s 56.1 ¶ 33.) She rejected the request because Binion allegedly kicked in his ex-girlfriend's door and could become involved in a domestic dispute. (Def.'s 56.1 ¶ 34.) She also said that she had heard Grey relate that information to a person with him in the jail area. (Def.'s 56.1 ¶ 34.) The next day, Grey reported to her that Johnson had given Binion bail money. (Def.'s 56.1 ¶ 34.)

Binion told Linder that he tried to call two people to help him with bail, but those two people did not respond. (Def.'s 56.1 ¶ 35.) Binion reported that Johnson and Grey discussed a release on recognizance and that Johnson provided him with $100. (Def.'s 56.1 ¶ 35.)

Johnson told Linder, in his interview, that Binion was his friend and that he arrested Binion and transported him to the police station. (Def.'s 56.1 ¶ 36.) Johnson said that he knew that Binion's bail was $100 and that Binion did not have enough money to post bond. (Def.'s 56.1 ¶ 36.) He knew that Binion had tried to secure bond money. (Def.'s 56.1 ¶ 36.) He asked Grey if it would be possible to obtain authorization to release Binion on his own recognizance, but he never heard from Grey if Grey had obtained such authorization. (Def.'s 56.1 ¶ 36.) Binion asked him if he could loan him $100, and he did. (Def.'s 56.1 ¶ 36.) Johnson said that he did not know what Binion was going to do with the money. (Def.'s 56.1 ¶ 36.) However, he did not loan Binion the money so that Binion could secure bond. (Def.'s 56.1 ¶ 36.) He provided the money as a friend. (Def.'s 56.1 ¶ 36.) He was not aware that it is unlawful for an officer to provide money to an individual to use to post bond. (Def.'s 56.1 ¶ 36.) Johnson told Linder that he had asked Grey if it would be permissible to give Binion money, and Grey said that it would. (Def.'s 56.1 ¶ 39.)

In his deposition, Johnson admitted that his statement that he did not know what Binion

would use the money for was not a true statement. (Def.'s 56.1 ¶ 38.) He also testified that Binion told him that Binion told Linder that Binion had dropped money in the squad car. (Def.'s 56.1 ¶ 41.) Binion told Linder that Johnson retrieved this money and returned it Binion. (Def.'s 56.1 ¶ 41.) Johnson knew this statement was untrue. (Def.'s 56.1 ¶ 41.) However, he did not report the untruthful statement to police department officials on the advice of his attorney and for fear of putting himself at further risk. (Def.'s 56.1 ¶ 41.)

Linder also collected prior employee contact forms concerning Johnson's behavior, as set out above. (Def.'s 56.1 ¶ 42.) Linder included these employee contact forms in his report. (Def.'s 56.1 ¶ 42.)

Miller received the report of inquiry, which included Linder's summary, the entire transcribed statements of the individuals interviewed and the shift-level disciplinary forms completed by Johnson's supervisors. (Def.'s 56.1 ¶ 43.) Miller interviewed Thiel about Johnson's overall performance and the appropriate level of discipline. (Def.'s 56.1 ¶ 44.) Thiel recommended Johnson's termination. (Def.'s 56.1 ¶ 44.) Miller interviewed Grey about the Binion incident, and Grey told Miller what he had told McKinley and Linder. (Def.'s 56.1 ¶ 44.)

Finally, Miller interviewed Johnson on June 4, 1999. (Def.'s 56.1 ¶ 45.) Miller asked Johnson whether Johnson had given Binion money to post bond. (Def.'s 56.1 ¶ 45.) Johnson said that the money had not been for bond. (Def.'s 56.1 ¶ 45.) Miller told Johnson that he believed that Johnson was not being honest with him and that he would recommend Johnson's termination. (Def.'s 56.1 ¶ 45.)

On June 8, 1999, Miller sent the Board a memorandum recommending Johnson's discharge based on Johnson's disciplinary history, his shift-level discipline and the Binion bail incident. (Def.'s

56.1 ¶ 46.) Miller believed that these events showed Johnson's poor judgment, questionable honesty, insubordination and arrogance. (Def.'s 56.1 ¶ 46.) Miller relied on these employee contact forms and the recommendations from Davis, McKinley and Thiel that Johnson had an "unsatisfactory and turbulent work performance." (Pl.'s 56.1 ¶ 50.) Miller relied on his conversations with McKinley and Thiel in his recommendation for termination. (Pl.'s 56.1 ¶ 51.) His recommendation discussed the employee contact forms and other counseling sessions with Johnson. (Pl.'s 56.1 ¶ 51.)

The Board met on June 10 or 11, 1999. (Def.'s 56.1 ¶ 47.) The Board considered Miller's memorandum of June 8, 1999, and questioned him for half-an-hour. (Def.'s 56.1 ¶ 47.) After excusing Miller, the Board spoke with Johnson's attorney, Jack Genius, for fifteen minutes. (Def.'s 56.1 ¶ 47.) At the conclusion of his presentation, Genius asked to submit a written memorandum to the Board. (Def.'s 56.1 ¶ 47.) The Board granted this request and permitted Miller to submit additional information. (Def.'s 56.1 ¶ 47.)

Miller submitted an additional memorandum on June 17, 1999. (Def.'s 56.1 ¶ 48.) Genius submitted a memorandum in opposition to Johnson's termination on June 16, 1999. (Def.'s 56.1 ¶ 49.) The Board reviewed these memoranda and held a second meeting on June 22, 1999, at which Genius was present. (Def.'s 56.1 ¶ 50.) At this meeting, after thirty minutes of deliberation, the Board terminated Johnson effective June 22, 1999, for failure to complete his probationary period. (Def.'s 56.1 ¶ 50.)

The record discloses several other disciplinary events involving Elgin police personnel. In 1992, during his probationary period as a police officer with the Elgin Police Department, Daniel McGinley: (1) became involved in a civil dispute stating, "don't mess with me, I'm a cop"; (2) was

issued a letter of reprimand for failure to appear for work; and (3) was counseled for being verbally and physically abusive with a citizen while making an off-duty uniformed traffic stop. (Pl.'s 56.1 ¶ 203.)

In 1996, during his probationary period as a police officer with the Elgin Police Department, Chris Hughes left his place of assignment and caused a disruption at a local school when he visited an ex-girlfriend. (Pl.'s 56.1 ¶ 172.) Hughes was suspended for five days for leaving his place of assignment. (Pl.'s 56.1 ¶ 174.)

In 1998, Jason Lentz, during his probationary period as a police officer with the Elgin Police Department, while en route to work and not yet on duty and in his personal vehicle, Lentz responded to a call to which he was not assigned. (Pl.'s 56.1 ¶ 184.) He missed roll-call and did not inform a supervisor. (Pl.'s 56.1 ¶ 184.) He received a letter of reprimand for absence from duty and use of a private vehicle. (Pl.'s 56.1 ¶ 185.)

Miller has recommended the termination of one other probationary officer. (Def.'s 56.1 ¶ 52.) On June 21, 2000, Miller recommended that the Board discharge Officer David Mendiola, who is not African-American, following Mendiola's indictment by a Kane County grand jury for an alleged aggravated assault and battery while at a shopping mall and off-duty. (Def.'s 56.1 ¶ 52; Pl.'s 56.1 ¶ 199.) The Board refused to discharge Mendiola. (Def.'s 56.1 ¶ 52.) Mendiola received a thirty-day suspension without pay for this conduct. (Def.'s 56.1 ¶ 52; Pl.'s 56.1 ¶ 200.)

In May 1999, a white Elgin Community Service Officer, Julie Kelly, allegedly provided bail money to her son when he was arrested in Wisconsin. (Def.'s 56.1 ¶ 51; Pl.'s 56.1 ¶ 119.) Community Service Officers are non-sworn officers who may accept bail and are authorized to admit persons to bail but have no arrest powers. (Def.'s 56.1 ¶ 51; Pl.'s 56.1 ¶ 118.) Kelly was never

disciplined nor charged with any violations and was not fired for this incident. (Pl.'s 56.1 ¶ 122.)

CSO Hill was investigated for an incident involving leaving the jail area for an extended period of time. (Pl.'s 56.1 ¶ 59.) CSO Hill told investigators that she did not know that she could not leave the jail unattended, despite the incident with Johnson just months earlier. (Pl.'s 56.1 ¶ 59.) Hill was not accused of making an inconsistent statement or of interference with an investigation. (Pl.'s 56.1 ¶ 59.) She was not disciplined in any manner for this incident; and there was, instead, a finding of a "policy failure". (Pl.'s 56.1 ¶ 59.) "Policy failure" means that there is a conflict between the Standard Operating Procedure and the practices of the department. (Pl. Ex. DDD at 8657.)

## DISCUSSION

Defendants Elgin, Miller, Burns, McKinley and Thiel move for summary judgment on Plaintiff Johnson's claim that Defendants violated Title VII or Sections 1981 and 1983 by discharging him because of his race. Defendants argue that summary judgment on Johnson's Title VII, Sections 181 and 1983 claims[2] is proper because Johnson cannot demonstrate that: (1) he performed his job satisfactorily; (2) any of the Defendants took an adverse employment action against him; (3) similarly situated employees were treated more favorably for similar conduct; and (4) even if Johnson could establish a *prima facie* case, he cannot show that Defendants' reasons for recommending Johnson's discharge are a pretext for race discrimination.

Plaintiff may prove discrimination under Title VII through direct evidence or indirectly

---

[2]     The evidentiary burden applicable to Title VII claims is also applicable to Section 1981 and 1983 claims. *See Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000) (analyzing discriminatory failure to train claim under Title VII, Sections 1981 and 1983 under the burden-shifting standards); *see also Eiland v. Trinity Hosp.*, 150 F3d 747, 751 (7th Cir. 1998) (applying burden-shifting standards to Title VII and Section 1981 claims).

through the burden-shifting mechanism of *McDonnell Douglas*.[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In this case, Plaintiff has presented no direct evidence of discrimination. Direct evidence of intentional discrimination entails proof of acknowledgment by the Defendants of a discriminatory motive. *Troupe v. May Department Store*, 20 F.3d 821, 823 (7th Cir. 1994).

Plaintiff has attempted to prove discrimination indirectly by arguing that he was treated differently from other non-black employees because of his race. To prove discrimination indirectly, Plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was meeting his employer's legitimate performance expectations; and (4) his employer treated similarly situated employees who were not in the protected class more favorably. *Maarouf v. Walker Manufacturing Co.*, 210 F.3d 750, 751 (7th Cir. 2000). Johnson cannot establish the second, third or fourth elements.

Johnson cannot show that he suffered an adverse employment action. Johnson argues that he suffered an adverse employment action because, in addition to being fired, he was unfairly disciplined by the individual Defendants for actions for which he would not have been disciplined, but for his race. Johnson further argues that Miller specifically relied on the discipline by the individual Defendants in deciding that Johnson should be terminated. The employee contact forms and other discipline are "not . . . adverse employment action[s] unless . . . [they are] accompanied

---

[3]    Under the *McDonnell Douglas* framework, a *prima facie* case of employment discrimination creates a rebuttable presumption that employer's actions, if unexplained, were the result of impermissible factors and shifts the burden of production to the employer to articulate some legitimate, nondiscriminatory reason for its actions; if the employer satisfies that burden, Plaintiff must then show that articulated reasons were pretextual. *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1261 (7th Cir. 1994).

by some other action, such as job loss or demotion." *Krause v. City of La Crosse*, 246 F.3d 995, 999 (7th Cir. 2001).

There must be a causal link between the disciplinary actions and the termination. *See Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) (holding that "the employer's adverse action [must] follow[] fairly soon" after the employee's protected expression to establish the required nexus for retaliation in violation of Title VII). In *Sweeney,* the Seventh Circuit reasoned that one day or one week might be sufficient to establish a causal link. 149 F.3d at 557. Here, the investigation concerning the Binion incident began in April 1999, and Johnson was discharged in June 1999. However, the last time Johnson was disciplined was in February 1999, almost five months earlier. This time lapse is too great to support Johnson's assertion that the disciplinary actions were tied to his discharge. Because Johnson cannot show that there is a causal link between his termination and the disciplinary actions, the disciplinary actions are not adverse employment actions. Therefore, Johnson cannot show that Burns, Thiel or McKinley took an adverse employment action against him.

Johnson also argues that Miller took an adverse employment action against him because Miller formally brought the charges to the Board of Fire and Police Commissioners and issued the letter terminating him. Although the Board of Fire and Police Commissioners terminated him, Johnson argues that it did so at the insistence of Miller. This argument also fails to establish that Miller took an adverse employment action against him.

Johnson cannot show that there was a "causal link between [Defendants' alleged discriminatory] animus . . . and the Board's hearing and independent decision to . . . terminate" him. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). To be able to establish a causal link between Miller's recommendation and the Board's decision to terminate him, Johnson

must be able to show that the Board was merely the cat's-paw of Miller. Johnson must be able to show that the Board "followed the biased recommendation without independently investigating the complaint against" Johnson. *Stimpson*, 186 F.3d at 1332.

The Seventh Circuit has held that there is only one situation which could establish that "the discriminatory motive of the other employee, not the autonomous judgment of the non-discriminatory decision-maker, is the real cause of the adverse employment action." *Wallace v. SMC Pneumatics*, 103 F.3d 1394, 1400 (7th Cir. 1997). To prevail pursuant to the *Wallace* holding, Johnson must show that Miller "by concealing relevant information from the . . . [Board] or feeding [it] false information . . . [was] able to influence the decision" to terminate him. *Wallace*, 103 F.3d at 1400.

However, the facts submitted in the record show that the Board acted independently. Johnson's attorney at the time, Jack Genius, addressed the Board for fifteen minutes, presenting Johnson's case and answering its questions. Furthermore, Genius submitted a written memorandum to the Board outlining Johnson's case and pointing out the positive aspects of Johnson's career with the Elgin Police Department. Genius's memorandum also informed the Board of Johnson's belief that he was being discriminated against on the basis of his race. The Board reviewed Genius's memorandum. The evidence shows that no relevant information was concealed from the Board. If any information presented to the Board had been false, and Johnson does not assert that it was, Johnson's counsel, Jack Genius, had an opportunity to apprise the Board that it was being misled. The Board deliberated for thirty minutes before making its decision. These facts establish that the Board's decision to terminate Johnson was an independent decision and that it was not the cat's-paw of Miller. Thus, there is no issue of material fact as to whether Miller or any other Defendant took

an adverse employment action against him.

Defendants also argue that Johnson cannot show that he was meeting his employer's legitimate expectations because of his "continued poor judgment, questionable honesty, insubordination, and arrogance." Defendants further argue that Johnson's ignorance of the law prohibiting police officers from providing bail money and his shift-level disciplinary history also prevent Johnson from showing that he was meeting the Elgin Police Department's legitimate expectations.

Plaintiff has not met his burden of showing that a rational jury could find that he was meeting the legitimate expectations of his employer. Defendants' argument that Johnson's shift-level disciplinary history indicates that he was not meeting his employer's legitimate expectations is undermined by the fact that on February 9, 1999, eleven days after Johnson's most recent shift-level discipline notice, a performance evaluation performed by Thiel rated Johnson as "completely satisfactory/acceptable performance" in twenty-one out of twenty-three categories.

However, "the critical issue is whether [Johnson] was performing well at the time of . . . termination." *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1262 (7th Cir. 1993). "[S]o long as the employer's employment expectations are 'in good faith[,] without fraud or deceit,' . . . [a court] only determine[s] if the employee met them." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000) (internal citation omitted). Here, Johnson did not meet the Elgin Police Department's legitimate expectation that he would not violate an Illinois state statute. Johnson admits that he gave Binion $100, that Binion used that money to post bond and that Johnson lied about the money's use in his interview with Miller. Johnson does not produce any evidence showing that the Elgin Police Department's expectation is unreasonable. It seems reasonable that an entity

charged with enforcing the laws would expect its employees not to break them. Thus, there is no issue of material fact as to whether Johnson was meeting the Defendants' legitimate expectations.

Finally, Johnson has not shown that his employer treated similarly situated employees who were not in the protected class more favorably. *Maarouf,* 210 F.3d at 751. Johnson claims that he was disciplined more harshly than similarly situated non-black police officers. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or their employer's treatment of them." *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir. 2000). Only probationary employees are similarly situated to other probationary employees. *See Spath v. Hayes-Wheels Int'l Indiana,* 211 F.3d 392, 397 (7th Cir. 2000) (holding comparable employees must be similarly situated "*in all respects*").

Here, Johnson cannot show that the Defendants treated non-black probationary officers less harshly than they treated him. Johnson argues that Julie Kelly, a white Community Service Officer, provided bail money to her son and was not disciplined by the Defendants. While Kelly is a person covered by the statute, her conduct took place in Wisconsin and not in Illinois. Johnson argues that the statute is ambiguous in that it does not specify a geographical limit. However, the law does not prohibit attorneys practicing in Illinois and officials authorized to accept bail or admit another to bail from providing bail money to another in any state or country. *See* 725 Ill. Comp. Stat. 5/110-13 (2001). Johnson has offered no support for his argument that Section 110-13 can be applied extraterritorially. Furthermore, Kelly was not a police officer, probationary or otherwise, but a CSO when she paid her son's bail in Wisconsin. Therefore, she is not a similarly situated non-black

employee.

Johnson has presented facts that other officers committed infractions during their probationary period.[4] For example, Hughes left his place of assignment during probation and was suspended. McGinley was involved in a civil dispute, issued a letter of reprimand for failing to appear for work, and counseled for being verbally and physically abusive with a citizen during an off-duty uniformed traffic stop during his probationary period. During his probationary period, Lentz responded to a call to which he had not been assigned in his own car and missed roll-call. He was issued a letter of reprimand. However, Hughes, McGinley and Lentz are not similarly situated employees because, while they were on probation, they were not accused of violating an Illinois state law and none of them were subject to a disciplinary decision by Miller.

Johnson also argues that CSO Hill was disciplined differently for an incident involving leaving the jail unattended. While Hill was subject to a disciplinary decision by Miller, Johnson has not presented any facts that show that Hill was a probationary employee at the time of this incident. Therefore, Hill cannot be a similarly situated employee.

There is only one officer who was similarly situated to Johnson. David Mendiola, like Johnson, was accused of violating an Illinois state law and was subject to a disciplinary decision by Miller. Mendiola was indicted for aggravated assault and battery committed while he was off-duty. Mendiola, like Johnson, was recommended for discharge by Miller. Therefore, there is no genuine issue of material fact as to whether similarly situated non-black employees were treated more favorably by the Defendants.

---

[4]     Plaintiff has not established that these employees were non-black, but it will be assumed that they are for the sake of argument.

Even assuming Johnson established a *prima facie* case of discrimination, he could not succeed on summary judgment because of his failure to show that Defendants' legitimate articulated reason for terminating his employment (that he exhibited poor judgment, questionable honesty, insubordination and arrogance) was pretextual. "A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). An honest belief in the non-discriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or baseless. *Debs*, 153 F.3d at 396.

Defendants present one reason for Johnson's discharge: Johnson's conduct in connection with the Binion bail incident evidenced his continued poor judgment, questionable honesty, insubordination and arrogance. Johnson argues that other officers lied or provided inconsistent statements but were not terminated. He also argues that Defendants simply chose not to believe his account of events connected to the Binion bail incident.

However, Johnson does not dispute that he gave money to Binion and that Binion used that money to post bond. Nor does he dispute that he lied as to material facts regarding giving Binion the money or as to his, Johnson's, knowledge of Binion's intended use of the money. Furthermore, he admits that it was poor judgment to lend Binion the money. (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 3, 13.) Johnson has not presented any evidence that this conduct did not, or was insufficient to, motivate the decision to recommend his discharge.

Thus, Johnson has offered no evidence from which a rational jury could conclude that Defendants did not honestly believe their proffered reason for recommending termination of his employment. Defendants' recommendation that Johnson be terminated represented an earnest

decision based on Johnson's "poor judgment and questionable honesty" in the Binion bail incident. Courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 920 (7th Cir. 1996).

## CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

John W. Darrah, Judge

United States District Court

Date: October 3 2001